IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CAROLYN BOTTOMS,                          )
                                          )   Case No. 03 C 1881
                    Plaintiff,            )
                                          )   Judge Virginia M. Kendall
            v.                            )
                                          )
ILLINOIS DEPARTMENT OF HUMAN              )
SERVICES, and CHICAGO-READ                )
MENTAL HEALTH CENTER,                     )
                                          )
                    Defendant.            )
                                          )

**MEMORANDUM OPINION AND ORDER**

Carolyn Bottoms ("Bottoms" or "Plaintiff") is a black female who was employed for nearly

nine years by the Illinois Department of Human Services ("IDHS"), most recently at its Chicago-

Read Mental Health Center facility ("Chicago-Read," together with IDHS, "Defendants"). After a

series of workplace incidents involving Bottoms, her supervisors ordered her to submit to a "fitness-

for-duty" examination on June 4, 1999. On November 16, 1999, Bottoms was discharged for her

repeated failure to attend that examination. Bottoms brings this action under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*, contending that: she suffered an adverse

employment action – termination – on account of her race; and Defendants' reason for terminating

her was to retaliate against her for having previously opposed Defendants' alleged discriminatory

practices.

Defendants now move for summary judgment on Bottoms's Title VII claim. Defendants

argue that: (1) Bottoms has presented no direct evidence of either race discrimination or retaliation;

(2) Bottoms cannot establish a *prima facie* case of race discrimination or retaliation because she has

not identified any similarly-situated non-black employees who were treated more favorably; and (3)

even if Bottoms could establish a *prima facie* case of race discrimination or retaliation, there were

legitimate, non-discriminatory reasons for her termination.

This Court finds that Plaintiff has not presented any direct evidence of either race

discrimination or retaliation and that Plaintiff has not demonstrated the existence of a genuine issue

of material fact bearing on whether Defendants treated any similarly-situated non-black employees

more favorably than Plaintiff or whether Defendants' articulated reasons for ordering Bottoms to

submit to a fitness-for-duty examination and for discharging her were a pretext for discrimination

or retaliation. Accordingly, Defendants' Motion for Summary Judgment is granted.

## STATEMENT OF FACTS

Bottoms, a black female, was employed by Chicago-Read for nearly nine years before she

was terminated on November 16, 1999. (Pltf.'s 56.1(b)(3)(C) ¶ 1; Def.'s 56.1 ¶ 5.)[1] From October

1998 until her termination, Bottoms was an Office Assistant in the General Stores division of

Chicago-Read, where her responsibilities included office-related duties such as typing, working with

---

[1] The facts are presented in the parties' statements pursuant to Local Rule 56.1. Defendants' Statement of Undisputed Material Facts is cited as "Def.'s 56.1 ¶ __"; Plaintiff's Response is cited as "Pltf.'s Response ¶ __"; Plaintiff's Statement of Additional Facts is cited as "Pltf.'s 56.1(b)(3)(C) ¶ __"; and Defendants' Response is cited as "Def.'s Response ¶ __".

  Plaintiff has also filed untimely supplemental responses to Defendants' motion for summary judgment. On November 16, 2006, this Court granted Plaintiff, proceeding *pro se*, leave to file supplemental responses by December 11, 2006, which deadline was subsequently extended three times at Plaintiff's request. The third extension allowed Plaintiff until February 6, 2007 to file supplemental responses. Without seeking a fourth extension of time, Plaintiff filed her supplemental responses on February 12, 2007. Nevertheless, the Court has taken Bottoms's supplemental responses under advisement in coming to its decision on Defendants' motion for summary judgment.

computers and answering the phone. (Def.'s 56.1 ¶ 6.)[2] Plaintiff's supervisor in General Stores was Marilyn Targos ("Targos"), who is white. (Pltf.'s 56.1(b)(3)(C) ¶¶ 2, 6.)

Bottoms previously sued Defendants in 2000, alleging violations of Title VII and 42 U.S.C. §§ 1981, 1983. (Def.'s 56.1 ¶ 11.); *see also, Bottoms v. Illinois Dep't of Human Services*, 174 F. Supp.2d 758 (N.D. Ill. 2001) ("*Bottoms I*"). Before filing *Bottoms I*, Bottoms filed an Equal Employment Opportunity Commission charge against defendants, dated June 14, 1999, alleging discrimination and retaliation in the form of constant harassment, placement on administrative leave in May 1999 and the order to report for a fitness-for-duty examination on June 4, 1999.[3] Bottoms also discussed her problems concerning Chicago-Read management with the statewide Equal Employment Opportunity officer during work hours. (Pltf.'s 56.1(b)(3)(C) ¶ 19.)

**The Relationship Between Bottoms and Targos.**

The relationship between Bottoms and Targos was strained from its inception. Upon the commencement of Bottoms's employment in General Stores, Targos "took note" of Bottoms and began logging the times Bottoms was absent from her work area without first advising anyone as to where she would be even though Targos did not log the times other employees briefly left their work stations without telling anyone. (Pltf.'s 56.1(b)(3)(C) ¶ 10.) Within the first two weeks of her tenure

---

[2] Though it is not clear from the parties' Rule 56.1 statements, Bottoms testified during her deposition that she worked as an Office Assistant in various departments of both Chicago-Read and another IDHS facility, the Illinois State Psychiatric Institute, from 1991 until she began working in General Stores in 1998. (Bottoms Dep., pp. 12-16.)

[3] In her brief in opposition to Defendants' motion for summary judgment, Bottoms urges this Court to find that the order to report for a fitness-for-duty examination constitutes retaliatory discipline in violation of Title VII. Judge Plunkett specifically held that this case is limited to Bottoms's Title VII claims for discriminatory discharge due to race or retaliation. *Bottoms v. Illinois Dep't of Human Services*, No. 03 C 1881, 2004 WL 1403811 *6-7 (N.D. Ill. June 22, 2004) ("The conduct at issue [in *Bottoms I*] occurred between August 1998 and June 14, 1999. Judge Conlon did not specifically address Bottoms's claims relating to her discharge and could not have addressed them because Bottoms had not yet completed the administrative process. . . . Defendants' motion to dismiss Bottoms's Title VII claims for discrimination and retaliation that occurred after July 20, 1999 is denied."). Accordingly, this Court will not address Bottoms's claims based upon Defendants' June 3, 1999 order to submit to a fitness-for-duty examination.

at General Stores, Bottoms refused to speak directly to Targos and requested that Targos provide all instructions regarding her job duties in writing. (Def.'s 56.1 ¶ 15; Bottoms Dep. p. 39:23-24, 40:1-13, 41:13-23.) At approximately the same time, Targos began performing certain of Bottoms's job duties. (Pltf.'s 56.1(b)(3)(C) ¶ 12.) Plaintiff alleges that Targos took her job duties away from her without any warning or explanation. (Pltf.'s 56.1(b)(3)(C) ¶ 13, 16-17.) Defendants deny that any of Bottoms's job duties were taken from her and instead argue that Targos was forced to perform certain of Bottoms's job duties because Bottoms was either unwilling or unable to perform those duties herself.[4] (Def.'s 56.1 ¶ 16-17; Def.'s Response ¶ 16-17. It is not disputed that during Bottoms's tenure at General Stores, she was idle for approximately 70% of her work day. (Def.'s 56.1 ¶ 17; Pltf.'s 56.1(b)(3)(C) ¶ 17.)

Targos met with Dr. James Brunner ("Brunner"), Hospital Administrator at Chicago-Read, to discuss the problems she was having with Bottoms. (Def.'s 56.1 ¶ 18.) Brunner suggested that Targos hold weekly supervisory meetings with Bottoms to review assignments. (*Id.*) At Brunner's urging, Targos advised Bottoms in March of 1999 that Bottoms would be required to attend twice-weekly supervision meetings with Targos. (*Id.* at ¶ 19.)

Bottoms advised Joan Bashaw ("Bashaw"), the Equal Employment Opportunity officer at Chicago-Read, that she objected to having supervisory meetings with Targos. (*Id.* at ¶ 20.) Bottoms insisted that a union representative be present at her first supervision meeting with Targos even though union representatives are not permitted at meetings where an employee is not being

---

[4]Targos states in her affidavit in support of Defendants' motion for summary judgment that Bottoms "routinely refused or simply failed to perform essential duties such as answering the telephone, filing, sorting mail, delivering paperwork and time-sheets, and being courteous to those that she came in contact with both in person and on the telephone." Def.'s Exh. E1 ¶ 6.

disciplined. (*Id.* at ¶ 21.) Bottoms's insistence upon the presence of a union representative prevented Targos from holding the first supervisory meeting she had scheduled with Bottoms. (*Id.*) Targos issued a written reprimand to Bottoms for her failure to attend the supervisory meetings scheduled for March 17, March 19, and March 24, 1999 and for failing to properly distribute mail to Targos. (*Id.* At ¶ 24.; Targos Affid. ¶ 12.)

On the day of the March 19, 1999 supervisory meeting, Bottoms alleges that Targos intentionally hit her with a locker door. (Def.'s 56.1 ¶22.) Targos testified at her deposition that she did not intentionally hit Bottoms with the locker door. (Pltf.'s 56.1(b)(3)(C) ¶ 25; Targos Dep. p. 47:9-14.) Bashaw investigated the incident but the results of her investigation were inconclusive because there were no witnesses to the incident aside from Bottoms and Targos and Bottoms did not report any injury. (Def.'s 56.1 ¶ 22; Bashaw Dep. P. 39:2-24; 40:1-9.) On the day of the March 24, 1999 meeting, Bottoms alleges that Targos "aggressively came after [Bottoms]." (Def.'s 56.1 ¶ 23; Pltf.'s 56.1(b)(3)(C) ¶26; Bottoms Dep. p. 187:15-20.) Bottoms called the police to complain about the incident, but did not file a police report. (*Id.*) Bottoms also alleges that Targos attempted to "close in Ms. Bottoms between a door and its gate." (Pltf.'s 56.1(b)(3)(C) ¶ 27.) Defendants do not dispute Bottoms's testimony with respect to either the March 24, 1999 incident or the incident

involving the door and gate.[5]   There is no evidence that Targos was disciplined as a result of these incidents.

On May 7, 1999, Targos attempted to meet with Bottoms and Bottoms threatened to call the police again if Targos attempted to speak with her at that time or in the future. (*Id.* at ¶ 26; Targos Affid. ¶ 15.)  Thereafter, management at Chicago-Read issued Bottoms a one day suspension for failure to participate in additional supervisory meetings scheduled for April 28 and April 29, 1999. (Def.'s 56.1 ¶ 25; Targos Affid. ¶ 14 and Exh. 2 thereto.)

**The Amoruso Memorandum and Bottoms's White Gloves.**

In late March and April of 1999, a representative of the IDHS Office of Internal Audit, Jack Amoruso ("Amoruso"), occupied an office adjacent to Bottoms while conducting an audit of property, equipment and inventories at General Stores.  (Def.'s 56.1 ¶ 28; Brunner Affid. ¶ 20.)  On April 30, 1999, Amuroso sent an unsolicited memorandum to Brunner outlining his observations of Bottoms.  (Def.'s 56.1 ¶ 28; Pltf.'s 56.1(b)(3)(C) ¶ 30.)  Amoruso advised Brunner in the memo that he had observed Bottoms doing very little work, behaving rudely towards her supervisor (Targos), and spending work time on personal matters.  (Def.'s 56.1 ¶ 28)

---

[5]  By way of example, at Pltf.'s 56.1(b)(3)(C) ¶ 26, Bottoms states that "Ms. Bottoms testified that at one point, Ms. Targos aggressively came at Ms. Bottoms, who backed up and called the police."  Defendants avoid addressing the substance of Bottoms's testimony by admitting only "that Plaintiff testified as described in paragraph 26."  (Def.'s Response ¶ 26.)  In contrast, at Pltf.'s 56.1(b)(3)(C) ¶ 7, Bottoms states that "Ms. Bottoms testified that on her first day on the job, Ms. Targos told Ms. Bottoms that Ms. Bottoms was placed there to get rid of her."  In response, Defendants deny "the allegations in paragraph 7" by referring to Targos's affidavit, in which Targos "vehemently" denies ever having made the statement Bottoms attributes to her.  (Def.'s Response ¶ 7.)  Because Defendants have not denied the substance of Bottoms's testimony – that "Ms. Targos aggressively came at Ms. Bottoms" and that Targos attempted to "close in Ms. Bottoms between a door and its gate"– the Court deems the facts to which Bottoms testified as admitted.  *See Schacht v. Wisconsin Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999)(indicating that summary judgment is the "'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.").

Amoruso's memorandum to Brunner also notes that Bottoms wore white gloves while at work "because she doesn't want to touch anything that any of the white employees touch." (Amoruso Memorandum at Def.'s Exh. D1; Pltf.'s 56.1(b)(3)(C) ¶ 31. Targos also was told that Bottoms wore the gloves to avoid touching anything that white employees had touched, though Targos cannot recall whether she received that information directly from Bottoms or from another source. (Pltf.'s 56.1(b)(3)(C) ¶ 32.) For her part, Bottoms testified that she is allergic to dust and that she wore the gloves to protect her hands from cuts and paper dust. (*Id.* at ¶ 33.) Bottoms never told anyone – including Amoruso – that she wore gloves to avoid touching things that had been touched by white employees. (*Id.* at ¶34.)

**Bottoms is Placed on Paid Administrative Leave for Injuring a Co-Worker.**

In May 1999, one of Bottoms's co-workers, Thomas Mathew ("Mathew") entered Bottoms's office to access a file cabinet. (Def.'s 56.1 ¶ 29.) Bottoms asked Mathew three times to close the door to her office. (*Id.*) When Mathew did not respond, Bottoms rose from her desk, reached around him and closed the door. (*Id.*) Matthew testified that Bottoms was somewhat angry when she got up to close the door. (*Id.* at ¶ 31.) Mathew testified that the door hit him on the elbow when Bottoms closed it which caused him to react with a "painful sound." (*Id.* at ¶ 33.) Although she admits that Mathew responded as if in pain, Bottoms denies that the door hit Mathew when she closed it. (Pltf.'s Response at ¶ 33.)

Mathew advised Targos that his elbow had been injured during the incident with Bottoms. (Def.'s 56.1 ¶ 34.) Targos took Mathew to the infirmary to have the injury examined. (*Id.*) As a result of the injury to his elbow, Mathew was placed on restricted duty and was instructed not to lift, carry, push or pull more than 20 pounds with his left arm. (*Id.* at ¶ 35.) On May 11, 1999, Brunner

placed Bottoms on administrative leave pending an investigation into the incident between Bottoms and Mathew. (*Id.* At ¶ 36.) The investigation, conducted by James Schiltz ("Schiltz") of the IDHS Office of Internal Review, found no evidence that the injury to Mathew was intentional, but determined that Bottoms had exhibited a disregard for Mathews's physical safety. (*Id.* at ¶ 37-38; Report of James Schiltz, Exh. 2 to Brunner Affid.)

**Bottoms is Terminated for Failure to Attend Mandatory Fitness-for-Duty Examination.**

By letter dated June 3, 1999, Brunner directed Bottoms, who was still on paid administrative leave from Chicago-Read, to attend a fitness-for-duty examination on June 10,1999 or face possible disciplinary action. (Def.'s 56.1 ¶ 45; Exh. 10 to Brunner Dep.) The purpose of the examination was to determine whether Bottoms suffered from any impairment or disorder that would either diminish her ability to function in the workplace or cause her to behave in a manner not safe for herself or for others. (Def.'s 56.1 ¶ 42.) Brunner's primary reason for referring Bottoms for a fitness-for-duty examination was the injury to Mathew, but he was also influenced by reports from Targos, Amoruso and Schlitz regarding Bottoms's increasingly inappropriate and hostile behavior. (Pltf.'s 56.1(b)(3)(C) ¶ 59; Def.'s 56.1 ¶ 43.)

Bottoms did not attend the fitness-for-duty examination on June 10, 1999. (Def.'s 56.1 at ¶ 45.) Instead, she sent a letter to Brunner expressing concerns about her privacy, accusing Brunner of retaliating against her for having filed previous charges of discrimination and indicating that she was seeking legal advice. (*Id.* at ¶ 46; Exh. 13 to Brunner Dep.) Plaintiff consulted an attorney and two union presidents regarding the directive to attend the fitness-for-duty examination. (Def.'s 56.1 ¶ 47.)

On June 15, 1999, Brunner sent Bottoms a second letter directing her to attend a fitness-for-duty examination on June 25, 1999. (*Id.* at ¶ 48.) Brunner's June 15, 1999 letter again advised plaintiff that her failure to attend the fitness-for-duty examination would be construed as an act of insubordination and could subject her to disciplinary action up to and including discharge. (*Id.*; Exh. 14 to Brunner Dep.) Bottoms responded to Brunner by letter dated June 23, 1999, noting receipt of Brunner's instruction to attend the fitness-for-duty examination and expressing confidentiality and privacy concerns. (Def.'s 56.1 ¶48, Exh. 16 to Brunner Dep.) Bottoms's letter further advised Brunner that Bottoms believed the instruction to attend the fitness-for-duty examination was "more retaliation and harassment due to charges of discrimination and retaliation." (Exh. 16 to Brunner Dep.) Despite receiving clear instructions to do so, Bottoms did not attend the June 25, 1999 fitness-for-duty examination. (Def.'s 56.1 ¶ 48; Exh. 16 to Brunner Dep.) As a result of her failure to attend a fitness-for-duty examination, Bottoms was referred for a pre-disciplinary meeting for insubordination on June 28, 1999. (Def.'s 56.1 ¶49.)[6] In August 1999, Bottoms was suspended pending discharge. (*Id.* at ¶ 51.) The suspension pending discharge was subsequently converted to a 25-day suspension, after which Bottoms was returned to paid administrative leave. (*Id.*)

On September 2, 1999, Brunner sent Bottoms a third letter directing her to attend a fitness-for-duty examination on September 7, 1999. (*Id.* at ¶52.) Brunner's September 2, 1999 letter advised plaintiff for the third time that her failure to attend the fitness-for-duty examination would

---

[6]It is not clear whether Bottoms was referred for a pre-disciplinary meeting for her failure to attend only the first fitness-for-duty examination or for her failure to attend both the June 10 and the June 25 examinations. Defendants state – and Bottoms admits – that Bottoms was referred for the June 28, 1999 pre-disciplinary meeting as a result of her failure to attend both the June 10, 1999 and the June 25, 1999 fitness-for-duty examinations. (Def.'s 56.1 ¶ 49; Pltf.'s Response ¶ 49.) However, Exhibit 19 to Bottoms's Deposition contains a Memorandum dated June 16, 1999 – before Bottoms had failed to attend the June 25, 1999 examination – advising Bottoms that a pre-disciplinary meeting had been scheduled for June 28, 1999 at 10:00 A.M.

be considered an act of insubordination that could subject Bottoms to disciplinary action up to and including discharge. (*Id.*) Brunner's September 2, 1999 letter also addressed Bottoms's concerns regarding her privacy and the reasons underlying her referral for a fitness-for-duty examination. (*Id.*)

Bottoms did not attend the September 7, 1999 fitness-for-duty examination and was subsequently charged with insubordination. (*Id.* at ¶ 55, 63.) Bottoms received a memorandum informing her of a pre-disciplinary meeting, which was scheduled for September 16, 1999. (*Id.* at ¶ 63.) Following the pre-disciplinary meeting, Bottoms was suspended pending discharge and was ultimately discharged on November 16, 1999. (*Id.* at ¶ 5, 63.)

**Defendants' Personnel Decisions Involving Other Employees.**

In 1995, a Caucasian Security Officer ("K.M.") at Chicago-Read was directed to report for a fitness-for-duty examination after he spoke of harming his supervisor and co-workers. (Def.'s 56.1 ¶ 76.) K.M. reported for the fitness-for-duty examination and was ultimately discharged for his statements. (*Id.*)

Also in 1995, a black Mental Health Technician ("J.J.") at Chicago-Read was ordered to attend a fitness-for-duty examination after she stated that she had been having thoughts of harming her co-workers, patients and family, and that she possessed a firearm. (*Id.* at ¶ 77.) J.J. refused to attend the fitness-for-duty examination and was discharged. (*Id.*) J.J. filed a charge of discrimination after she was discharged. (*Id.*)

In 1997, a Caucasian Psychologist at Chicago-Read ("N.C.") was directed to report for a fitness-for-duty examination after threatening to harm the Facility Director. (*Id.* at ¶ 78.) N.C. filed a charge of discrimination after he was directed to report for the examination. (*Id.*) N.C. attended

the fitness-for-duty examination, participated in out-patient therapy sessions, and was not discharged. (*Id.*)

## PROCEDURAL HISTORY

Following her termination in November 1999, Bottoms filed a charge of discrimination with the Illinois Department of Human Rights on May 15, 2000, wherein she claimed she was discharged in retaliation for opposing unlawful discrimination. Bottoms litigated her discharge before the Illinois Civil Service Commission. An administrative law judge ("ALJ") held that Bottoms's discharge was warranted. On September 20, 2000, the Illinois Civil Service Commission adopted the ALJ's findings and conclusions and upheld the decision to discharge Bottoms. Thereafter, Bottoms filed a petition for administrative review in the Circuit Court of Cook County, Chancery Division. That court upheld the decision of the Illinois Civil Service Commission. Bottoms then sued IDHS, Chicago-Read and two individuals in federal court, alleging violations of Title VII, 42 U.S.C. §§ 1981, 1983. *See Bottoms I*. On April 24, 2001, Judge Conlon granted summary judgment in favor of the defendants in *Bottoms I*.

Bottoms brought this action in March 2003, alleging violations of Title VII, 42 U.S.C. §§ 1981, 1983, and the Americans With Disabilities Act ("ADA"). In June 2004, the Court granted Defendants motion to dismiss with respect to Bottoms's ADA claims as well as her claims under 42 U.S.C. §§ 1981, 1983. Now before this Court is Defendants' motion for summary judgment.

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(c).  In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion.  *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000).  Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment.  An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate.  *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

## DISCUSSION

Plaintiff alleges both race discrimination and retaliation by Defendants under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.* Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  Title VII also prohibits an employer from discriminating against any employee for having opposed any practice made an unlawful employment practice under Title VII.  42 U.S.C. § 2000e-3(a).

# I.     Race Discrimination Claim

To overcome Defendants' motion for summary judgment, Bottoms may proceed under either the direct or indirect method of proving that Defendants took an adverse employment action against her because of her race. Under the direct method, Bottoms must show, using either direct or circumstantial evidence, that the motivation behind her termination was race. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). But because the direct method of proving racial discrimination "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus," this option is not available to many aggrieved employees. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Bottoms does not point to any direct evidence of race discrimination. Accordingly, if she is to survive Defendants' motion for summary judgment on her race discrimination claim, she must do so under the indirect method.

When a plaintiff lacks direct evidence of discriminatory motive, courts apply the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under the *McDonnell Douglas* framework, Bottoms must first present a *prima facie* case of discriminatory discharge by showing that: (1) she is a member of a protected class; (2) she was performing at a level that met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) another similarly situated individual who was not in the protected class was treated more favorably than she was treated. *Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 750-51 (7th Cir. 2006) (*citing McDonnell Douglass*). This *prima facie* showing creates an initial presumption that the employer unlawfully discriminated against its employee. *See St. Mary Honor Center v. Hicks*, 509 U.S. 502, 506-07 (1993) ("To establish a presumption is to say that a finding of the predicate fact (here, the prima facie case) produces a required conclusion in the absence of explanation (here,

the finding of unlawful discrimination).") (internal quotation marks omitted). If Bottoms can demonstrate such a prima facie case, the burden shifts to Defendants to produce a legitimate, non-discriminatory reason for Bottoms's termination. *Paul v. Theda Med. Ctr., Inc.*, 465 F.3d 790, 794 (7th Cir. 2006); *see also St. Mary Honor Center*, 509 U.S. at 509 (observing that the employer's burden is one of production only and not persuasion). If the Defendants can produce such a reason, Bottoms has an opportunity to demonstrate that the articulated reason is, in fact, a pretext. *Paul*, 465 F.3d at 794. In this context, a pretext is "a lie, specifically a phony reason for some action." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999).

Defendants concede for the purpose of summary judgment that Plaintiff is a member of a protected class, and that Plaintiff suffered an adverse employment action when she was discharged. Defendants argue that Plaintiff has not proven that she met their legitimate expectations or that Defendants treated any similarly situated, non-black employee differently than they treated her.

### A.    Bottoms Did Not Meet Defendants' Legitimate Expectations.

In order to make out her *prima facie* case, Bottoms must demonstrate that she met Defendants' legitimate expectations. The record reveals that she did not. Bottoms was idle for approximately 70% of her work day. She refused to speak with her direct supervisor and was issued a written reprimand for her failure to attend several supervisory meetings with her supervisor. Bottoms also failed on three occasions to follow her employer's direct instructions to attend a mandatory fitness-for-duty examination. Each of the three times the examination was scheduled, Defendants warned Bottoms that her failure to attend could subject her to disciplinary action up to and including termination. The record reflects that Bottoms was an insubordinate employee who

was not meeting Defendants' legitimate expectations, that she was repeatedly informed of her failure to do so, and that she made no effort to comply with their reasonable requests. Accordingly, Bottoms cannot demonstrate that she met her employers' legitimate expectations. *Bottoms I*, 174 F. Supp.2d at 765 (*citing Kirk v. Fed. Prop. Mgmt. Corp.*, 22 F.3d 135, 139 (7th Cir. 1994) for the proposition that "[a]n employee who is insubordinate does not perform her job satisfactorily.").

### B. Similarly Situated Employees.

Bottoms has also failed to prove that Defendants treated any similarly situated, non-black employees more favorably in making discharge decisions. "[I]n disciplinary cases – in which a plaintiff claims that he was disciplined more harshly than a similarly situated employee based on some prohibited reason – a plaintiff must show that he is similarly situated with respect to performance, qualifications and conduct. This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000) (internal citations omitted). The similarly situated inquiry is not rigid or inflexible; it considers all relevant factors, the number of which will depend on the context of the particular case. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). With respect to those relevant factors, "an employee need not show complete identity in comparing [herself] to the better treated employee, but [she] must show substantial similarity." *Id.*

Bottoms has not identified any similarly situated non-black employees who received more favorable treatment than she did after engaging in similar conduct. For her part, Bottoms attempts

to shift the analysis by asserting that *Defendants* have failed to show that similarly situated non-black employees were also referred for fitness-for-duty examinations for reasons similar to those that motivated Defendants to refer Bottoms for a fitness-for-duty examination. Her attempt to shift the focus fails for two reasons.

First, it is Bottoms that has the burden of demonstrating that defendants have treated similarly situated non-black employees more favorably. *Burks*, 454 F.3d at 750-51. Bottoms has not pointed to a single similarly situated non-black employee in any position at Chicago-Read who was not terminated after engaging in conduct similar to Bottoms's conduct.[7] Second, this Court has already specifically held that this case is limited to Bottoms's claims for discriminatory *discharge* and that Bottoms is barred from pressing her Title VII claims based upon Defendants' June 3, 1999 order to submit to a fitness-for-duty examination. *Bottoms v. Illinois Dep't of Human Services*, No. 03 C 1881, 2004 WL 1403811 *6-7 (N.D. Ill. June 22, 2004).

In any event, Bottoms has failed to present any evidence whatsoever that any similarly situated non-black employee at Chicago-Read was not referred for a fitness-for-duty examination after engaging in conduct similar to Bottoms's conduct. Bottoms argues that Targos, who is white, was not referred for a fitness-for-duty examination after Bottoms complained that Targos had hit her with a locker door while Bottoms was referred for an examination after the incident with Mathew. Setting to one side the fact that Bottoms is barred from complaining that the order to attend the fitness-for-duty examination constitutes unlawful discrimination under Title VII, her argument fails

---

[7]Indeed, Bottoms concedes at p. 10 of her Response to Defendants' motion for summary judgment that "other employees may have been terminated for their failure to attend a fitness-for-duty examination." She argues, though, that "no other employee has been terminated for refusing to attend an evaluation that was based upon trivial, biased and racist reasons." However, Bottoms has not identified a single employee that was not terminated after refusing to attend a fitness-for-duty evaluation.

because Targos is not a sufficient comparator. There is no "substantial similarity" between Bottoms and Targos. Targos was Bottoms's supervisor; she and Bottoms clearly held substantially different positions with different responsibilities. *Humphries*, 474 F.3d at 405 (finding a sufficient comparator to plaintiff in another employee who held the same position with the same duties and who shared the same supervisor and same ultimate decisionmaker).

Bottoms has not demonstrated that she met Defendants' legitimate expectations or that Defendants treated any similarly situated non-black employees more favorably than she was treated. Accordingly, she has failed to make out her *prima facie* case of discrimination and cannot survive summary judgment on this claim.

### C.    Pretext.

Because Bottoms failed to establish a *prima facie* case of race discrimination, it is not necessary for this Court to reach the issue of pretext. *Burks*, 464 F.3d at 754 (*citing Haywood v. Lucent Techs.*, 323 F.3d 524, 531 (7th Cir. 2003)). Nevertheless, the Court addresses the issue briefly for the sake of completeness.

Even if Bottoms had established a prima facie case for discrimination, Defendants would have the opportunity to rebut that *prima facie* case by articulating a legitimate, nondiscriminatory reason for terminating her. *McDonnell Douglas*, 411 U.S. at 802. In other words, even if Bottoms had established conclusively that the decision to fire her was motivated in part by discrimination, Defendants could still avoid liability by demonstrating that they would have made the same decision despite the alleged unlawful motive. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) (*citing Gleason v. Mesirow Fin. Inc.*, 118 F.3d 1134, 1140 (7th Cir. 1997)). Defendant states that

Bottoms was terminated for insubordination, not because of her race. Because this nondiscriminatory reason has been proffered, the burden shifts to Bottoms to establish that reason as a pretext. *Paul*, 465 F.3d at 794.

In order to show pretext, Plaintiff must demonstrate that Defendants' proffered motivation for her termination "is a lie or completely lacks a factual basis." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000). Courts are "not concerned with whether or not the employer's actions were mistaken, ill considered or foolish, so long as the employer honestly believed those reasons." *Burks*, 454 F.3d at 754 (citing *Jordan*, 205 F.3d at 343) (internal quotations omitted). An employee cannot "avoid summary judgment by merely claiming that a jury could disbelieve the employer's reason." *Traylor v. Brown*, 295 F.3d 783, 791 (7th Cir. 2002). Instead, an employee must put forth evidence suggesting that the employer itself did not believe the proffered reasons for termination. *Burks*, 454 F.3d at 754-55.

In this case, Bottoms has not demonstrated that Defendants' proffered motive for her termination - insubordination - is a pretext. Bottoms has put forth no evidence that Defendants did not believe the proffered reason for termination. To the contrary, Bottoms concedes that she failed to follow the instructions to attend the fitness-for-duty examination even after having been advised that her failure to attend would be viewed as insubordination that could subject her to disciplinary action.[8] Even if she had made out her *prima facie* case, Bottoms would still be required to set forth

_____

[8]Though she concedes failing to attend the fitness-for-duty examination, Bottoms argues that Brunner's decision to refer her for that examination was the result of his reliance on "racist misinformation" from Targos and Amoruso. Bottoms states that both Targos and Amoruso told Brunner that Bottoms wore white gloves in order to avoid touching things white persons had touched. Bottoms characterizes this as a "racist observation with no basis in fact" and argues that because Brunner relied upon that kind of information from Targos and Amoruso in making the decision to refer Bottoms for the fitness-for-duty examination, his decision to do so was tainted by racism. Bottoms's argument is contrary to the record, which indicates that Brunner's primary reason for referring Bottoms for the fitness-for-duty examination

18

specific evidence demonstrating that Defendants' proffered reason for her termination was a lie; having failed to do so, Bottoms cannot show pretext, and thus her case cannot survive summary judgment on this claim. *Id.* at 755.

## II.     Retaliation Claim.

As with her race discrimination claim, Bottoms may overcome Defendants' motion for summary judgment with respect to her retaliation claim by proceeding under either the direct or indirect methods. *Humphries*, 474 F.3d at 404. Bottoms does not present any direct evidence of retaliation. Instead, she proceeds under the indirect method.

Bottoms's retaliation claim also fails under the indirect approach. Under the indirect approach, Bottoms must demonstrate that after she complained of discrimination, she, and not any other similarly situated employee who did not complain, was subject to an adverse employment action even though she was performing up to Defendants legitimate expectations. *Roney v. Illinois D.O.T.*, 474 F.3d 455, 459 (7th Cir. 2007) (citing *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006)). The failure to satisfy any one element of this *prima facie* case is fatal to an employee's retaliation claim. *Id.* (citing *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004)).

There is no dispute that Bottoms engaged in protected activity when she filed an EEOC charge of discrimination and retaliation against Defendants or that she suffered an adverse employment action when she was terminated. Bottoms fails to demonstrate that she was performing

was that she had caused an injury to one of her coworkers. In any event, Bottoms concedes that she repeatedly failed to attend the examination and offers no evidence that would suggest that Defendants' real reason for terminating her was anything other than the proffered reason - her insubordinate behavior.

up to Defendants' legitimate expectations and that after complaining of discrimination, only she, and not any other similarly situated employee who did not complain of discrimination, was subject to an adverse employment action.

As an insubordinate employee, Bottoms cannot demonstrate that she was performing up to her employer's legitimate expectations. *Bottoms I*, 174 F. Supp.2d at 765 (*citing Kirk v. Fed. Prop. Mgmt. Corp.*, 22 F.3d 135, 139 (7th Cir. 1994) for the proposition that "[a]n employee who is insubordinate does not perform her job satisfactorily."). Nor can Bottoms identify any similarly situated employees that did not complain about discrimination who were treated differently. In fact, Defendants identify one employee, J.J., a black Mental Health Technician at Chicago-Read, who did not complain about discrimination but who was also terminated after refusing to attend a fitness-for-duty examination.[9] Defendants also identify another employee, N.C., who complained of discrimination after being referred for a fitness-for-duty examination but who was not fired after he attended the examination and participated in out-patient therapy sessions. Having failed to identify even a single similarly situated employee who did not complain about discrimination and was treated differently, Bottoms cannot prevail on her retaliation claim and Defendants are entitled to judgment as a matter of law.

**CONCLUSION AND ORDER**

Reviewing all of the evidence in the record and drawing all reasonable inferences in favor of Bottoms, there is no genuine issue as to any material fact that Defendants treated similarly-situated non-black employees more favorably than Bottoms or that Defendants' articulated reason

---

[9]J.J. later filed a charge of discrimination *after* she was discharged.

for discharging Bottoms was a pretext for discrimination. Further, there is no genuine issue as to any material fact that after Bottoms complained of discrimination she, and not any other similarly situated employee who did not complain, was subject to an adverse employment action. Wherefore, Defendants' Motion for Summary Judgment is granted.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: March 9, 2007